HELDMAN CLOTHING COMPANY v. OATES.

Opinion delivered July 8, 1918.

1. EVIDENCE—SALE OF STOCK OF GOODS—PAROL PROOF THAT MORTGAGE WAS INTENDED.—Where parties entered into a written contract, which on its face purported to be a sale of a stock of merchandise, as against a third party, parol testimony is not admissible to show that the transaction was intended to be a mortgage.

2. MORTGAGE—CHATTELS—SALE.—The difference between a mortgage and a sale is that in a sale title passes absolutely, whereas the mortgagor may pay the debt and disencumber the property.

3. BULK SALE—INTENTION OF THE PARTIES.—Under the Bulk Sales law, the purchaser who has not complied with the statute, becomes a receiver of the stock of goods and is liable *pro rata* to the seller's creditors; and this rule is not affected by the fact that the buyer and seller acted in good faith with no intent to defraud.

Appeal from Pope Chancery Court; *Jordan Sellers,* Chancellor; reversed.

*J. G. Wallace & Son,* for appellant.

1. The contract was a sale, not a mortgage, and is void under the Bulk Sales Act No. 88, 1913. The sale was complete and consummated before the contract was reduced to writing. It has all the elements of a sale; it passes title and possession and is unconditional, and Ross is to act only as agent of Oates. 222 Mass. 587; 127 Ga. 454.

2. If a mortgage it is void as to appellant as in fraud of creditors. 23 Ark. 262; 7 Ark. 269.

3. Oates should be held as receiver under the act. Acts 1913, No. 88; 123 Ark. 285; 127 *Id.* 296.

*U. L. Meade,* for appellee.

1. In the light of all the surrounding circumstances, their acts and the evidence the contract was a mortgage. and so intended. It was not a sale under the Bulk Sales Act. Parol testimony was admissible that the writing was a mere security for a debt. 38 Ark. 264; 13 *Id.* 116; 40 *Id.* 146; 51 *Id.* 433; 78 *Id.* 527; 18 *Id.* 24; 70 *Id.* 299; 88 *Id.* 299; 105 *Id.* 314.

2. But if a sale notice was waived and within the act. 70 *Id.* 401. See also 59 Ark. 344; 71 *Id.* 556. Appellant and other creditors had due notice.

SMITH, J.   J. B. Ross was engaged in the mercantile business at Russellville, and he incurred obligations amounting to something over six thousand dollars. He realized his inability to pay this indebtedness and he had

a friend to interview his creditors and submit to them a proposition to take fifty cents on the dollar in satisfaction of their demands. All of the creditors assented to this proposition except the Heldman Clothing Company, of Cincinnati, Ohio, which company had an account amounting to $585. To raise the money required to make the settlement proposed Ross entered into an agreement with R. M. Oates, which was reduced to writing and reads as follows:

"Know all men by these presents: That I, J. B. Ross, has this day sold to R. M. Oates his stock of merchandise, fixtures, and all goods in bulk in the store house situated on the east side of Jefferson street in the city of Russellville, Arkansas; said sale is for cash and for $3,000, this day paid by the said R. M. Oates to the said J. B. Ross, the receipt of which is hereby acknowledged. And on the same day, towit, January 15, 1917, the said J. B .Ross delivers the possession and title to said stock of goods and fixtures to R. M. Oates, provided, that the said J. B. Ross, as the agent of the said R. M. Oates shall have the privilege of selling said stock of goods and fixtures for the said R. M. Oates any time within thirty-five days from this date, for a better price and at a profit if he can do so.

"And should said J. B. Ross or R. M. Oates find a purchaser and sell said stock and fixtures at a better price and profit, then in that event said J. B. Ross is to have the benefit of said profit, after paying back to the said R. M. Oates said $3,000 with ten per cent. interest thereon, per annum, from the 15th day of January, 1917, until paid.

"It is further understood and agreed that the said J. B. Ross shall continue in possession of said stock of goods and fixtures as the agent of R. M. Oates for thirty-five days unless sooner sold to any other, and sell for cash at retail said stock and merchandise as before, but is to keep a correct account of all daily sales and cash received by him on said sales, beginning with the 15th day of January, 1917, and deposit each day's sales or

cash taken in before the bank closes each day, in the People's Exchange Bank, of Russellville, Arkansas, in the name of R. M. Oates, provided further, that the said R. M. Oates is not chargeable with or liable for store house rent or clerk hire or any other expense, in conducting the business during said thirty-five days; said stock of merchandise is to be sold at retail or until sooner sold.

"It is further understood and agreed to that said stock of goods and fixtures are to be insured against loss by fire for at least $2,000, payable to R. M. Oates at the cost and expense of J. B. Ross, and if said stock and fixtures are already insured for said amount or more then said insurance policy be and the same is hereby transferred and assigned to the said R. M. Oates, as his interest might appear.

"This sale is unconditional and the title and possession to said stock of goods and fixtures, herein mentioned, have this day passed from J. B. Ross to R. M. Oates, and the said J. B. Ross is acting only as the agent for the said R. M. Oates in the further conducting and management of said business.

"It is further understood and agreed to that said R. M. Oates takes said stock of goods and fixtures free from debts for the purchase price for any part of said goods, and the said R. M. Oates assumes no liability whatever for any of the debts or liabilities of the said J. B. Ross connected with the merchandise business or otherwise.

"Given under our hands in the city of Russellville, Arkansas, on this 15th day of January, 1917.

"R. M. Oates,
"J. B. Ross."

After executing this agreement Ross negotiated a sale of the goods to Darr & Darr, of Atkins, Arkansas, for 67½ cents on the dollar of the invoice price, and this sale netted Ross about $5,000. The clothing company then brought suit to have Oates declared a receiver of the stock of goods under the provisions of Act No. 88 of the

Acts of 1913, page 326. This is the act commonly designated as the Bulk Sales Law.

The provisions of the act were not complied with by giving the notice to creditors there provided for; but it is earnestly insisted that the transaction between Ross and Oates did not constitute a violation of the act, in that no sale of the goods was made to Oates. The court below so found and dismissed the complaint as to Oates, but rendered a personal judgment against Ross, and the clothing company has duly prosecuted this appeal.

(1) The writing set out purports to evidence a sale and the transaction throughout is designated as a sale and it is recited that "This sale is unconditional * * *." But it is contended that the agreement between Ross and Oates which was in fact made was a mortgage, and not a sale, of the property, and Oates and Ross gave testimony which evidently convinced the chancellor of that fact. Was the parol testimony admissible to vary the terms of the writing set out above? A similar question was involved in the case of *Appolos* v. *Brady,* 49 Fed. 401, which was a decision by the Court of Appeals for this circuit. There a writing was in form an assignment, but the parties to it undertook, as against an attaching creditor, to show that it was in fact a mortgage, the instrument being void as an assignment under the laws of the Indian Territory because it directed the assignee to sell at a private sale and no bond was filed as required by the statute. As stated, the case arose in the Indian Territory, and as it involved a construction of the Arkansas statute on the subject of assignments, which had been adopted by the Congress of the United States for that territory and which was then in force, the court followed the Arkansas cases which are there cited. The court held that parol testimony was inadmissible for the purpose of showing that the parties to the instrument had in fact intended to execute a mortgage, and not a deed of assignment, and in doing so said:

"The point of the inquiry is, what was the purpose of the party in executing a given instrument? and, as

against persons not parties thereto, the intent must be held to be that which is properly derivable from the language of the instrument, applied to the subject-matter and read in the light thrown thereon by the attending circumstances and the acts done in carrying the contract into effect. Where the rights of the parties to the instrument are alone involved, and they agree upon the meaning thereof, a court would be justified in assuming their construction to be correct, without close scrutiny of the legal effect of the language used in the written instrument, but when the parties to the instrument rely thereon, as a means of defeating action taken by third parties, and limiting rights acquired in or to the subject-matter of the contract, then such third parties have the right to insist that, as against them, the written instrument can not be held to mean or intend anything other or different from the purpose which the language of the instrument, read in the light of its attending circumstances, shows to have been the intent of the parties in executing it.  *  *  *.

"* * * To defeat the attachment, it was proposed to show, not the acts of the parties done in connection with the possession and sale of the property, but the intent existing in the minds of the parties, or the belief they entertained that the instrument was, in legal effect, a mortgage, and not a deed of assignment.

"It was not error to reject evidence of this nature. Had it been admitted, it would have been the duty of the court to instruct the jury that, as against third parties, who can have no knowledge of secret purposes existing in thought only, and who have the right to regulate their action by that which the parties cause to appear in an open and usual manner, no weight could be given to evidence of this character as against that afforded by the written instrument and the acts of the parties in connection therewith, and that, therefore, it must be held that the instrument under which the intervener claimed the property was a deed of assignment, and as such was

void under the provisions of the statute regulating assignments.''

See, also, *Box* v. *Goodbar,* 54 Ark. 6; *Richmond* v. *Mississippi Mills,* 52 Ark. 30.

Having concluded that the character of the instrument as against the creditor must be determined by its recitals and the acts of the parties done in connection with the possession and sale of the property, rather than from a consideration of any private understanding between Oates and Ross, we turn to a consideration of the legal effect of the instrument itself.

(2)   Does the writing evidence a mortgage or a sale? An almost indefinite number of cases have discussed the difference between a sale and a mortgage, and many of these cases are found in our own reports. *Dicken* v. *Simpson,* 117 Ark. 304; *American Mortgage Co.* v. *Williams,* 103 Ark. 484; *Hays* v. *Emerson,* 75 Ark. 551; *Hershey* v. *Luce,* 56 Ark. 320; *Harmon* v. *May,* 40 Ark. 146; *Gibson* v. *Martin,* 38 Ark. 207. The cases cited cite other Arkansas cases to the same effect. These cases recognize the fundamental difference between a mortgage and a sale to be that the title passes absolutely in a sale, whereas a mortgagor has the right to pay the debt and disencumber the property. Here the instrument expressly recites that ''This sale is unconditional,'' and it contains no clause of defeasance. It is true that it does allow Ross to remain in possession of the goods, and does give him the right to resell them, but the instrument expressly recites that he does so as agent for Oates. It only gave Ross an agency to resell property belonging to Oates, and the value of this agency was dependent upon the price he could obtain for the goods. But the goods became and remained the property of Oates until they were resold by Ross for Oates. Ross' possession of the goods was that of an agent or a broker with the right to take as compensation for his services any profits accruing from a resale of the goods. And a transaction of that character is not a mortgage.

(3)    Section 1 of the Bulk Sales Act provides that a sale, transfer or assignment in bulk of any part of or the whole of a stock of merchandise otherwise than in the ordinary course of trade and in the regular prosecution of the business of the seller shall be void as against the creditors of the seller unless the provisions of the act in regard to the giving of notice to the creditors are complied with.    And the liability of the purchaser is not made to depend upon the good or bad faith of his purchase.    It is not necessary to consider whether the debtor is attempting to defraud his creditors and the purchaser participates in that purpose.    If there is a sale, transfer or assignment under the circumstances stated, the purchaser becomes a receiver of the stock of goods and liable *pro rata* to the creditors.    *Stuart* v. *Elk Horn Bank & Trust Co.,* 123 Ark. 285.

So that, although Ross and Oates may have acted in entire good faith and with no purpose to defraud Ross' creditors, still the legal effect of their transaction, as disclosed by the writing which evidenced it, was to transfer the absolute legal title to the stock of goods, and that transaction is within the purview of our Bulk Sales law. It follows, therefore, that the decree of the court below must be reversed, and it will be so ordered, with directions to the court to proceed in accordance with the opinion of this court in the case of *Stuart* v. *ElkHorn Bank & Trust Co., supra,* in the distribution of the proceeds of the sale of the stock of goods.    See, also, *Ledwidge* v. *Arkansas National Bank, post,* p. 420.